# IN THE MATTER OF HARRY L. SHAW, AN ATTORNEY-AT-LAW.

Argued October 6, 1981—Decided March 25, 1982.

Colette A. Coolbaugh, Secretary, argued the cause for complainant Disciplinary Review Board.

Francis J. Hartman argued the cause for respondent.

PER CURIAM.

The Disciplinary Review Board (DRB) considered two presentments filed by the District IV Ethics Committee for Camden and Gloucester Counties (Committee). Those presentments dealt with three areas of alleged misconduct on the part of respondent, Harry L. Shaw, growing out of his representation of clients involved in automobile accidents occurring in 1973 and 1975.

I

The first allegation of ethical misconduct was that respondent unethically induced the driver and passenger in the 1973 accident to undergo unnecessary medical treatment to bolster their otherwise inconsequential claims for personal injuries. The DRB was troubled by the wide discrepancies between the versions of the driver and passenger on the one hand and the respondent on the other, and by the fact that the treating physician had not been subpoenaed to testify before the local Committee. However, on the record before it, the DRB was

"constrained to take no action regarding this portion of the case." Our independent review of the record leads us to concur in that determination. We therefore turn to the two remaining charges, as to which the DRB concluded that ethical infractions had been established by clear and convincing proof.

## II

The second allegation grew out of respondent's representation of both the passenger and driver of one automobile involved in a two vehicle accident on June 24, 1973 in Palmyra, New Jersey. The complainant, Efraim Martinez, was the driver and Edwin Santana was his passenger. The DRB found, and respondent admits, that by July 1972 respondent was representing both complainant and his passenger for claims arising out of that accident. His efforts to settle the Martinez and Santana claims were unsuccessful. Events thereafter, as summarized by the DRB, were as follows:

[O]n or about June 15, 1975 respondent, as attorney for [the driver, Martinez], filed a complaint in the Superior Court of New Jersey, Law Division, Burlington County, naming Gertrude Fuller, the driver of the other vehicle, as the sole defendant.

On June 24, 1975 respondent, as attorney for Edwin Santana, filed a complaint in the same court, naming both the complainant and Ms. Fuller as defendants. The second paragraph of the second count of that complaint read thusly:

"At the aforesaid time and place the defendant Efraim Martinez so carelessly, negligently, and wantonly drove his vehicle so as to cause it to come into violent contact with the vehicle driven by Gertrude Fuller whereby the plaintiff was permanently injured, requiring him to incur substantial medical bills, present and future and preventing him from attending to his business."

Respondent's representation of both Martinez and Santana continued until January 12, 1976, when another attorney was substituted as attorney for Martinez. In his answer to the complaint respondent explained his failure to withdraw from Mr. Martinez' representation as of June 24, 1975 as a "clerical error by my office". In his letter of June 15, 1979 submitted to the Board prior

to its consideration of this matter respondent stated that he met with a representative of Ms. Fuller's insurance company in July 1974 and verbally settled both cases. Subsequently that particular representative left the employ of the insurance company and the settlement agreed to could not be finalized. Finally, as the time for the running of the Statute of Limitations approached, respondent was unable to find an attorney willing to take one of the cases, and, as a last resort, filed both complaints.

Shaw's representation of these conflicting claims continued until January 12, 1976, when he turned the Martinez file over to another attorney. Respondent's only explanation for clinging to both files so long was that he was unable to find other counsel willing to handle one of the claims.

The local Committee determined that Shaw's conduct in representing the competing claims of both Martinez and Santana was clearly unethical. It recommended a private reprimand. The DRB ultimately filed a report and recommendation with this Court calling for respondent's suspension from the practice of law for six months. However, while the matter was pending here, an additional ethics complaint was lodged against Shaw, wherefore we ordered the Martinez-Santana matter remanded to the DRB for further consideration after the second complaint had been processed.

In its final determination the DRB reiterated its conclusion that respondent's representation of the driver and passenger, and, more particularly, his representation of the passenger in a suit against his own client, driver Martinez, clearly violated DR1–102(A)(5) and (6), prohibiting conduct prejudicial to the administration of justice and conduct reflecting adversely on a lawyer's fitness to practice law, and DR5–101(A), requiring a lawyer to "decline proferred employment" when it would create a conflict of interest. The DRB found that Shaw acted unethically by bringing suit against Martinez despite Santana's complete lack of interest in pursuing the claim. Moreover, Shaw

failed to inform Santana of his intention to file the suit in Santana's behalf. The DRB concluded that respondent should have recognized the conflict and withdrawn from the representation immediately rather than continue the dual representation for seven months after the filing of suit.

III

The third allegation contains charges of the utmost seriousness: in essence, that respondent "purchased" a claim from one of his clients. Because the events that give rise to this allegation are complex, the DRB discussed them in detail. Our examination of the record leads us to the same factual findings as were reached by the DRB. Mindful of the requirement that the quality of the supporting evidence be clear and convincing, we repeat the substance of the DRB's findings and conclusions and adopt them as our own:

> The respondent represented Frank C. Weber, IV, in a personal injury action arising from a November 1975 automobile accident. Mr. Weber, whose serious injuries required that a plate be implanted in his skull several months after the accident, found the business card of John T. Blandi, manager for Harry Shaw, attorney, among his papers when discharged from St. Francis Hospital on December 12, 1975. Weber then met with Blandi and discussed his case with him. From December of 1975 through mid-1976, Weber apparently was seeking funds from Blandi. In mid-1976, Weber met with Blandi and respondent at Blandi's apartment in Trenton. Weber's case, including the work done by respondent and insurance coverage available, was discussed at that time. In addition, Weber was given $500 either by respondent or his employee, Blandi.

> Through the remainder of 1976, Weber continued to seek funds from Blandi, and, additionally, attempted to check on the status of his case. In the Spring of 1977, Weber returned to the Trenton area from an extended visit with relatives in Colorado, and attempted to contact the respondent for another loan. He was advised at that time by Blandi that there were no further developments in the case and that an additional loan would not be forthcoming. During the next several months, Weber attempted to contact respondent via numerous collect telephone calls, which respondent's secretary refused to accept. He left messages with Blandi's answering service but his calls were

not returned. Weber finally reached the respondent in late September 1977, after writing to him, detailing his attempts to contact Blandi. In December, he finally reached Blandi, borrowed $200, and left the State to visit relatives in the West. On his return to New Jersey in the Spring of 1978, Weber again contacted Blandi for another loan. He was then advised that neither respondent nor Blandi would loan him any additional funds, but that they would purchase the case from him for $40,000. Upon Blandi's assurance that this was commonly done, Weber agreed.

Pursuant to this agreement, Weber met with Blandi on March 30, 1978, at which time Blandi advised that they could pay only $30,000. Weber agreed to the reduced amount, and signed some blank forms. His signature was not notarized at that time. He then accompanied Blandi to the White Horse Savings and Loan Company on South Broad Street in Trenton, where Weber received $1,000 in cash and a check for $29,000 from the cashier. Blandi and Weber then proceeded to the New Jersey National Bank where Weber deposited the $29,000 in a savings account. Weber was apparently advised that it might be necessary for him to testify if the case proceeded to court. Weber did not attempt to contact respondent or Blandi thereafter since he believed the case was resolved. He never endorsed any checks or drafts from an insurance carrier.

On July 3, 1978, approximately three months after "selling" the case to respondent and Blandi for $30,000, Weber's case was settled for $97,500. The cases of Cathy Parker and Doris Parker, two other clients of the respondent involved in the same accident, were also settled on that date for $100,000 each.

A Fireman's Fund Insurance Company draft dated July 24, 1978 made payable to Frank Clifford Weber in the amount of $83,660 was turned over to Blandi by the respondent following settlement. On the back of the draft, both the respondent's and Weber's names were typed below the signatures. The signature of John Blandi also appears, and it was determined by the Committee that Blandi signed Weber's name. Following receipt of the draft from respondent, Blandi deposited it in his account at the White Horse Savings and Loan Association on August 22, 1978.

In addition, a Continental Insurance Company draft dated July 29, 1978 in the amount of $8,334 payable to "Frank Clifford Weber and Harry L. Shaw, Attorney" was endorsed in exactly the same manner as the Fireman's Fund draft to Weber. Weber's name was signed by Blandi and John Blandi's signature appears below the name. That draft, too, was deposited by Blandi in the White Horse Savings and Loan Association.

A similar circumstance occurred with an $83,667 draft, dated July 26, 1978, payable to Cathleen Parker and respondent as her attorney from Fireman's Fund. The client's and attorney's names were typed on the back of the draft below the signatures. Blandi's signature also appeared. The draft was given to Blandi by respondent, and was then deposited by Blandi in his own account at the White Horse Savings and Loan Association on August 10, 1978.

A draft of $83,667 payable to Doris Parker and respondent as her attorney was endorsed for deposit in respondent's trust account.

Inquiries by Weber's future father-in-law, Jerry Conners, in 1979, led to consideration of this matter by the District IV Ethics Committee. Subsequent to the filing of this ethics complaint with the District IV Ethics Committee, respondent, by Carlos Morcate, who was then his attorney, delivered a check drawn on the White Horse Savings and Loan in the amount of $35,320.76 to Conners. At the time, both Conners and Weber refused to sign the releases prepared by the respondent.

At hearing before the District IV Ethics Committee, John Blandi testified that he personally loaned $30,000 to Weber to gain an 8% return on his money. The Committee found this testimony to be incredible since Blandi admitted that he expected the case to be settled within a week or two and since Blandi stated that he routinely carried around with him cashier's checks in three to ten thousand dollar amounts for weeks at a time. This practice was considered to be inconsistent with his claimed purpose, which would have garnered only two or three percent additional interest over that which the money would have earned in the White Horse Savings and Loan.

The respondent claimed that he obtained six individual drafts totalling $35,-320.76 for the express purpose of paying the balance of the settlement to Weber. However, the Committee noted that the drafts, in varying amounts, were payable to Blandi and in one instance to Blandi and one Rosali Tagliarino, were dated from August through November, and were never received, cashed, or returned to either Blandi or the bank. The Committee therefore determined that the drafts were neither drawn to pay Weber nor sent to Weber. In addition, the Committee found that:

1. respondent turned the proceeds of the Weber settlement over to Blandi rather than depositing the monies in his trust account as required by the rules of court;
2. the $30,000 paid to Weber in March, 1978 was an attempt to purchase Weber's cause of action, rather than a loan or partial payment;
3. neither respondent nor Blandi attempted to make payment to Weber following the July, 1978 settlement until April of 1979, *after* the filing of the instant ethics complaint.

The Committee concluded that respondent's actions violated *DR* 2–103, since he had, in essence, improperly solicited employment by Weber; *DR* 9–102(A) in failing to deposit the settlement monies in his trust account; *DR* 9–102(B)(4) in failing to promptly pay Weber the monies due to him; and, generally, *DR* 1–102(A)(1), (4) and (6) in that his conduct involved dishonesty, fraud, deceit and misrepresentation adversely reflecting on his fitness to practice law.

At hearing before the Disciplinary Review Board, respondent's attorney argued that respondent was not aware of the solicitation of Weber by Blandi,

and that two of the five ethical violations charged relate to acts of respondent's employee rather than of respondent.

\*       \*       \*       \*       \*       \*       \*       \*

\* \* \* The facts adduced at hearing clearly support the charges of solicitation in contravention of *DR* 2–103 and of acquisition by respondent of an interest in the litigation through purchase of the cause of action from the client in violation of *DR* 5–103. The evidence establishes that respondent did not contact Weber after the "purchase" of his cause of action even though Weber's approval of the terms of the settlement should have been obtained prior to finalizing the agreement. Furthermore, the Weber settlement drafts were given by respondent directly to Blandi after respondent endorsed them. Respondent did not contact Weber for his signature, place the draft in his trust account or transfer the appropriate amount to the client, in direct contravention of *R.* 1:21–6 and *DR* 9–102 \* \* \*. Weber did not receive the balance of the settlement until after the filing of an ethics complaint. By these actions, it is apparent that respondent engaged in an active misappropriation of funds belonging to Weber. See *In re Wilson*, 81 *N.J.* 451, 455 (1979) where misappropriation was defined as "... any unauthorized use by the lawyer of client's funds entrusted to him, including not only stealing, but also unauthorized temporary use for the lawyer's own purpose, whether or not he derives any personal gain or benefit therefrom". Indeed, these actions are proof of respondent's actual knowledge of and involvement in the "buying" of Weber's cause of action. His participation in such a scheme is unconscionable, adversely reflects on the fitness of the respondent to practice law, *DR* 1–102(A)(6), and violates *DR* 1–102(A)(1), (2), (4) and (5).

The Board is aware of the extensive involvement of respondent's employee, John Blandi, in the Weber matter. We are, however, convinced that his employee's actions were taken with respondent's full knowledge, cooperation and consent. Furthermore, respondent was actively involved in the representation of Weber, and, as such, had to be aware of Blandi's activities with respect to his client. The responsibility for the extensive ethical violations which occurred in this case therefore cannot be sloughed off on his employee, but must rest with the respondent. It was respondent's duty to his profession and to his clients to insure strict compliance with the Disciplinary Rules. He failed in this duty, and must therefore suffer the consequences.

## IV

▮ As to the conflict-of-interest charges arising out of the dual representation of Martinez and Santana, the rule relied on

by the DRB has long been that where liability is in dispute, a lawyer cannot represent the interests of both the driver of a vehicle and his passenger in claims against the driver of the adverse vehicle. The conflict of interest in such representation is inherent. See Advisory Committee on Professional Ethics Opinion 248, reprinted in 96 *N.J.L.J.* 93 (1973); Advisory Committee on Professional Ethics Opinion 188, reprinted in 93 *N.J. L.J.* 789 (1970). Shaw's dual representation of Martinez and Santana was a blatant violation of this long-standing rule, exacerbated by the fact that he filed a complaint as attorney for Santana against Martinez, his own client.

Equally plain is respondent's complete abandonment of any pretense of professional ethics in the Weber matter. Shaw's conduct amounted to nothing less than a "confidence game," albeit on a more imaginative level than is generally encountered. That Blandi participated, even to the extent of acting as the "front man," does not relieve respondent of his professional obligation.

We do not for a moment believe that Shaw was the unwitting victim of Blandi's machinations. But given the modern, sophisticated techniques of law office management, it may be that in the future we will be called upon to address more frequently in ethics proceedings the problem of lawyer responsibility for agents' derelictions. Should that occur, the bodies that conduct hearings and make determinations below will have to take pains to make specific findings of fact on managers' and paralegals' collaboration in any nefarious scheme. The dreary scene played out in these proceedings should alert lawyers to the necessity of exercising a high degree of caution in the choice and supervision of their paralegals, office managers and others who exercise authority. The opportunity for a venal manager to victimize a

young lawyer is all too apparent, although we repeat that Shaw was hardly victimized by Blandi in the matter before us.

As for Blandi himself the Court has no disciplinary jurisdiction over him. We would tend to look askance, however, at any lawyer's establishing an office relationship with one who had been implicated previously in an unscrupulous scheme like the one presented here. Absent a rule on the subject, *cf. R.* 1:21–2 (employment of disbarred or suspended attorney prohibited), we will continue to address the problem on a case-by-case basis, with an eye to improving the ethics of support staff and minimizing the dangers of a rascal moving about in the profession.

V

The DRB recommended that Shaw be suspended for three years. We entertain a different view of the appropriate discipline. It is difficult to imagine a more sinister threat to a professional relationship than the conduct so painstakingly portrayed in the DRB's report. Under the circumstances we conclude respondent must be disbarred. He is also required to reimburse the Administrative Office of the Courts for appropriate administrative costs, including production of transcripts.

So ordered.

*For disbarment*—Chief Justice WILENTZ and Justices PASHMAN, CLIFFORD, SCHREIBER, HANDLER, POLLOCK and O'HERN—7.

*Opposed*—None.

### ORDER

It is ORDERED that HARRY L. SHAW of Camden be disbarred and that his name be stricken from the roll of attorneys of this State, effective immediately;  and it is further

ORDERED that HARRY L. SHAW be and hereby is permanently restrained and enjoined from practicing law;  and it is further

ORDERED that HARRY L. SHAW reimburse the Administrative Office of the Courts for administrative costs arising out of these disciplinary proceedings, including the cost of production of transcripts;  and it is further

ORDERED that the respondent comply with all the Regulations of the Disciplinary Review Board governing suspended, disbarred or resigned attorneys.