582 A.2d 622

IN THE MATTER OF ARTHUR J. MAURELLO, AN
ATTORNEY AT LAW.

October 24, 1990.

## ORDER

ARTHUR J. MAURELLO of Asbury Park, who was admitted
to the bar of this State in 1976, having tendered his consent to
disbarment as an attorney at law of the State of New Jersey,
and good cause appearing;

It is ORDERED that ARTHUR J. MAURELLO is disbarred
by consent, effective immediately; and it is further

ORDERED that respondent's name be stricken from the roll
of attorneys and that he be permanently restrained and en-
joined from practicing law; and it is further

ORDERED that respondent comply with Administrative
Guideline No. 23 of the Office of Attorney Ethics dealing with
disbarred attorneys.

## APPENDIX

*Decision and Recommendation of the
Disciplinary Review Board*

To the Honorable Chief Justice and Associate Justices of the
Supreme Court of New Jersey.

These matters are before the Board based on two present-
ments filed by the District IIA Ethics Committee.

DOCKET NO. DRB 89–077

DISTRICT DOCKET NO. IIA–88–8E

*The Bauer Matter*

Respondent was admitted to the New Jersey bar in 1976. On
July 10, 1986, respondent was contacted by an acquaintance,
Albert Jannsens, inquiring whether respondent could give him

the original will of Jannsens' mother, Helen Bauer, who had died the day before.[1]  In that will, Jannsens had been named executor of his mother's estate.  Jannsens picked up the will that same day.

On July 14, 1986, the three beneficiaries under the will, Jannsens and his two sisters, Denise Dramm (hereinafter "Grievant") and Marie Uzzalino, met with respondent at his office.  In his capacity as executor, Jannsens hired respondent to handle the administration of the estate.  Jannsens paid respondent a $200 retainer from Jannsens' personal account.

Later that week, Jannsens gave respondent certain original stock certificates from American Telephone and Telegraph Company ("AT & T"), Bell Atlantic Corporation and Bell South Corporation.  The stock had a total value of approximately $8,000.

Between July 25 and July 28, 1986, respondent sent certified letters to the transfer agent, transmitting the original stock certificates and requesting that new certificates be issued in the names of the three beneficiaries.  Sometime before mid-September, 1986, the transfer agent sent to respondent's office the security transfer requirement forms to be filled out and signed by Jannsens, as executor of the estate.  On October 2, 1986, respondent returned the forms to the transfer agent, duly signed by Jannsens.

On October 3, 1986, respondent received a letter from an attorney, advising him that she had been retained by grievant and her sister, Marie Uzzalino, and addressing some issues of concern to her clients.  The attorney made no mention of any problems with the stock certificates.  On October 7, 1986, respondent replied to the attorney's letter.

Sometime between October 15 and October 27, 1986, the transfer agent notified respondent that Jannsens' signature had

---

[1] Respondent drafted Mrs. Bauer's will in 1980.

to be guaranteed by a commercial bank or trust company. Although respondent apprised Jannsens of this requirement shortly thereafter, Jannsens did not have his signature guaranteed until March 30, 1987, five months later.[2] On April 10, 1987, respondent forwarded the forms to the transfer agent.

The events that unfolded thereafter are unclear. As respondent testified, either (1) the certificates were sent to his office, where they may have been misplaced, or (2) the certificates were sent to his office, but never received, or (3) the certificates were not sent to his office at all. Respondent does recall that, ultimately, new certificates had to be issued; they were forwarded directly to grievant and her sister. None of the certificates in Jannsens' name was lost or misplaced, only those belonging to grievant and her sister.

In March 1988, grievant filed an ethics grievance against respondent (Exhibit J-1 in evidence), claiming that respondent had "handled this whole matter of transferring some stock in a very unprofessional manner," and that she had called respondent's office "over 5 times" to obtain information about the stock.

On September 15, 1988, a formal ethics complaint was filed, charging respondent with lack of diligence and failure to communicate with grievant, one of the estate beneficiaries (count one); pattern of neglect, following a public reprimand in 1986 (count two); and lack of cooperation with the ethics investigator (count three).

Grievant did not testify at the committee hearing, ostensibly because of the inconvenience of having to travel from Lake Placid, New York, where she resides. The ethics investigator

---

[2]As Jannsens stated in his affidavit (submitted after the committee hearing, with the panel's consent, and admitted into evidence), there was no need to process the certificates quickly, because the stock could not be negotiated before the death of the recipient of the stock dividends, Jannsens' grandfather, who was still living.

testified, however, about her conversations with grievant. In addition, certain handwritten notes by grievant were admitted into evidence (Exhibit P–1).

At the conclusion of the ethics hearing, the panel found that respondent had failed to communicate with grievant and her attorney (*R.P.C.* 1.4); handled the estate in a non-diligent fashion (*R.P.C.* 1.3); and failed to safeguard the property of third persons (*R.P.C.* 1.15). The hearing panel report concluded that

> The specific events surrounding this complaint may not ordinarily be sufficiently grievous for public discipline, and if the panel examined this as an isolated incident, the respondent's negligent conduct may not rise to the level of unethical conduct; however, this panel was profoundly distressed by these events taking place so close in time to the publication of the public reprimand of this respondent in 1986 for a pattern of neglect as well as the prompt resumption of poor habits.

[Hearing Panel Report at 5.]

The committee recommended that count three of the complaint (failure to cooperate with ethics investigator) be dismissed.

DOCKET NO. DRB 89–279

DISTRICT DOCKET NO. XIV–89–31E

*The Peak Matter*

The improper events that gave rise to this matter must be considered against the backdrop of identical behavior previously exhibited by respondent, which led to the imposition of a public reprimand in 1986. *Matter of Maurello*, 102 *N.J.* 622, 510 *A.*2d 36 (1986).

*The Prior Ethics Matter*

Grievant, Martha Peak, and respondent were married in September 1976. Three years later, in September 1979, they separated. Grievant moved to New York; respondent remained in the marital home in New Jersey, in which he also

maintained an office for the practice of law. In June 1981, the parties were divorced.

When grievant moved out of the marital residence, she and respondent reached an understanding that all mail addressed to her would be forwarded to her New York address.

In August 1983, grievant was notified that one of her credit card accounts was delinquent. When she contacted the bank, she learned that respondent had been using that account regularly for some time and that the statements were mailed to respondent's home office. Respondent admitted the use of the credit card, but explained that he did not intentionally try to damage the credit of his former wife.[3]

In addition to having used grievant's credit card without her knowledge or authority, respondent attempted to manipulate a witness, Marion Reynolds, in an election contest. In a 1979 primary election, respondent was one of three candidates for two municipal council vacancies. Grievant, at that time respondent's wife, was a candidate for the Republican County Committee. Both respondent and grievant lost the election, grievant having received three fewer votes than Reynolds. At a subsequent meeting with Reynolds, respondent informed her that he had filed a lawsuit challenging the results of both his and his wife's elections, naming Reynolds as a defendant. Respondent advised Reynolds that her residence in a certain municipality would place doubt on her eligibility to vote in another municipality. He promised her, however, that he would withdraw his challenge to her county committee position if she did not appear in court to oppose his challenge to the residential requirements.

---

[3]Grievant testified that the reason respondent used her credit card and not one of his own was that he had filed, or intended to file, for bankruptcy to discharge certain financial obligations, namely a student loan and monies owed to his uncle.

The Court ordered that respondent be publicly reprimanded for the above and other ethics transgressions. In mitigation, the Court considered respondent's candor in readily acknowledging the impropriety of his conduct.

*The Current Ethics Matter*

In November 1983, during the pendency of the prior disciplinary proceeding and a mere few weeks before the district ethics committee hearings took place in December 1984, respondent, once again without grievant's knowledge or consent, began to use two credit cards issued in grievant's name, Visa and MasterCard. The record shows that, sometime before November 1983, Horizon Bank sent to respondent's address two pre-approved credit card applications in grievant's name. Respondent opened the mail addressed to grievant, inserted his own name as co-applicant, furnished a false name for grievant's employer, and forged grievant's signature on the application, all without grievant's knowledge or approval (Exhibit C–9).

Armed with his ex-wife's credit cards, respondent embarked on a calculated course of regular misuse of his ex-wife's creditworthiness, in the face of his own inability to obtain credit. Between January 1986 and November 1988 alone, respondent charged in excess of $23,000 to grievant's accounts, including approximately $3,400 at a photo shop in New York City, and hotels and restaurants in Ocean City, Maryland, and New Orleans.[4] On at least one occasion, respondent's charges exceeded the credit card limit; on twelve occasions, the accounts became delinquent.

In November 1988, grievant received from TRW Credentials Service an abstract of her credit record (Exhibit C–3A). It was then that grievant discovered, for the first time, that there existed two credit cards in her and respondent's joint names and, to her horror, that respondent had obtained the cards

---

[4] The charges from November 1983 through December 1985 are unknown.

through forgery and deceit, more than two years after their divorce was granted and four years after their separation.

By letter dated November 16, 1988, grievant demanded that respondent satisfy the outstanding balances and close the accounts (Exhibit C–3D). On November 18, 1988, grievant notified the district ethics committee of respondent's misconduct (Exhibit C–3). On November 26, 1988, respondent informed grievant that the accounts had been paid in full (Exhibit C–32).

By subsequent letter to respondent on December 12, 1988, grievant expressed her "... gratification that [respondent took] the responsibility for curing the bad Horizon Bank accounts ... tempered, however, by ... memory of similar assurances made—and subsequently violated—by [respondent] in the past" (Exhibit C–33). In that same letter, grievant requested that respondent remove her name from a $28,000 mortgage loan on the former marital residence. Pursuant to the parties' property settlement agreement signed at the time of their divorce, respondent had assumed full responsibility for the mortgage payments. That mortgage was in grievant's name alone.

On January 13, 1989, during a telephone conversation with grievant, respondent told her that he would pay off the mortgage. In return, he asked grievant to withdraw her ethics grievance. Grievant's reply was that she would give that proposal some thought over the weekend. When respondent telephoned her two or three days later, grievant agreed to withdraw her grievance, subject to the execution of a written document memorializing the terms and conditions of the parties' understanding. Respondent volunteered to be responsible for any legal fees and expenses incurred by grievant in connection with the agreement.

On January 26, 1989, grievant and respondent signed a stipulation of settlement prepared by grievant's New York

attorney (Exhibit C–24).[5]  The stipulation recited the sequence
of events that led to the issuance of the two credit cards,
including the fact that respondent forged grievant's signature
and supplied false information on the pre-approved applications,
all without grievant's knowledge (Exhibit C–24, paragraphs G
and H).  Other relevant provisions of the stipulation were
respondent's promise to satisfy the existing mortgage and
grievant's agreement to withdraw the ethics grievance (Exhibit
C–24, paragraphs 4 and 8).

Indeed, by letter dated January 26, 1989, grievant informed
the secretary of the district ethics committee of her intention
not to proceed with the ethics grievance against respondent.
Grievant also requested that all further communication by the
committee be directed to her attorney (Exhibit C–29).  On
February 1, 1989, the investigator assigned to this matter wrote
to grievant's attorney advising him that, after an ethics investi-
gation has begun, grievances may not be withdrawn.  The
investigator also inquired whether grievant would voluntarily
provide information previously requested by the investigator
(Exhibit C–38).  By letter dated February 7, 1989, grievant's
attorney replied to the investigator that grievant did not wish
to pursue the matter and that, hence, grievant would not
respond to the investigator's letter requesting information
about the ethics matter (Exhibit C–37).

On March 1, 1989, during a telephone conversation with
respondent, the investigator, who had already been informed by
grievant's attorney of the existence of the stipulation of settle-
ment between grievant and respondent, asked respondent
whether there was such a written document.  Respondent false-
ly replied that there was not.  At the request of the investiga-
tor, respondent prepared and executed an affidavit swearing

---

[5]Grievant acknowledged that the stipulation incorrectly listed the year of the
opening of the credit card accounts as 1981, instead of 1983 (Exhibit C–24,
paragraph G).

that there were no "... written agreements relating to any matter executed between myself and Martha H. Peak at any time during calendar year 1988 through the present, in New York, New Jersey or any other jurisdiction. Hence, there is no correspondence respecting any written Agreements" (Exhibit C–18). That affidavit was false, as evidenced by the stipulation of settlement signed by grievant and respondent on January 26, 1989 (Exhibit C–24), and by correspondence exchanged between respondent and grievant's attorney (Exhibits C–21 and C–24A).

In view of grievant's unwillingness to cooperate with the investigation of the ethics matter, the district ethics committee filed a motion seeking to compel grievant to give testimony. In a letter-memorandum to the court in opposition to the motion, respondent falsely contended that grievant had authorized the use of her credit cards and that when he "... became aware of [grievant's] letter [to the committee] ... he telephoned her and reminded her of the facts surrounding the issuance and use of the credit card[s.].... [grievant then] recalled the situation more fully, and realized that her initial letter to the Committee Secretary had been in error." Respondent also alluded to grievant as "... someone who has obviously thought better of her initial and impulsive correspondence" (Exhibit C–19, Point Four, at 4).

Similarly, in his certification to the court in opposition to the motion, respondent falsely stated under oath that "... after I learned of Ms. Peak's incorrect assertion, I telephoned her and reminded her of the exact facts going back to 1983, surrounding the credit card usage. Thereafter, she obviously recalled more accurately what had transpired and, being the fair-minded person that she is, decided not to proceed further. Should she be penalized for an honest mistake by now having to give a deposition before this Committee [?]" (Exhibit C–2, paragraph 7).

On May 5, 1989, the Supreme Court of the State of New York, Appellate Division, Second Judicial Department, ordered

that grievant appear at the offices of counsel to the First Judicial Department, New York, to give testimony and produce documents necessary for the prosecution of the ethics matter against respondent (Exhibit C–31A). On May 24, 1989, grievant's deposition took place. Respondent elected not to attend the deposition.

Grievant categorically denied (1) that she had received the pre-approved applications for the credit cards; (2) that she had authorized respondent to fill out the applications and to use her credit cards; and (3) that she had any telephone conversations with respondent regarding the applications. She testified that the aforementioned statements in respondent's letter-memorandum and certification were blatantly false: at no time did she and respondent have any conversation wherein she "recalled more accurately what had transpired," that is, that she had "authorized the use of the credit cards" (T5/24/1989 85 to 95). Grievant also testified that respondent lied in a letter to the investigator dated February 16, 1989 (Exhibit C–30), twenty days after respondent signed the stipulation of settlement reciting the true sequence of events. In that letter, respondent falsely contended that "... the pre-approved application was sent to me sometime in late 1983; I filled in only the last two lines thereof, printing and signing my name as Co–Applicant; I then forwarded [it] to Marty for her to fill out the remainder and submit the form. (I had already discussed this with her by telephone)."

On May 25, 1989, the investigator testified before the committee. Although respondent was present at the hearing, he chose not to cross-examine the investigator; neither did he testify on his own behalf. Similarly, after the direct testimony of grievant's attorney on June 20, 1989, respondent elected not to cross-examine him or to testify, albeit he attended the hearing. Respondent requested that the committee allow him to submit a written summation within ten days thereof. The committee agreed. Respondent, however, never did so.

The testimony of grievant's attorney was also revealing. With respect to respondent's letter to the investigator stating that he, respondent, had discussed the pre-approved applications with grievant (Exhibit C–30 at 2), the attorney testified as follows:

... I called Mr. Maurello and particularly with regard to the statement in parenthesis at the top of page two which stated "I had already discussed this with her by telephone," referring to the credit card application, I said, I told him that this was not what had happened according to my client, and he confirmed that that was indeed not what happened, that the statement was untrue.

[T6/20/1989 19—1 to 9.]

At the conclusion of the district ethics committee hearing, the panel found that

[T]he evidence against the respondent in support of the allegations of the Complaint is uncontroverted and overwhelmingly establishes that the respondent did engage in the conduct set forth in the Complaint which includes the improper application for the credit cards without the authorization or knowledge of his former wife, the forging of her signature on the application, the misstatement of information on the application in order to receive the credit cards, the improper opening of mail addressed to his former wife, and the violation of the prohibitions set forth in the public reprimand of the respondent issued in June, 1986 by the Supreme Court of New Jersey. As clearly established by uncontroverted and overwhelming evidence ... the respondent sought to cause the complainant to withdraw the complaint before the ethics committee and to refuse to participate in the investigation by improper means including the agreement to pay off certain obligations in the name of the complainant and further did misrepresent the existence of such oral and written agreements with the complaints both to the investigator of the complaint and in documents and certifications filed with the Court handling a procedural aspect of the investigation.

[Hearing Panel Report at 13.]

## CONCLUSION AND RECOMMENDATION

Upon a *de novo* review of the record, the Board is satisfied that the conclusions of the district ethics committee in finding respondent guilty of unethical conduct in the *Peak* matter (Docket No. DRB 89–279) are fully supported by clear and convincing evidence. The Board does not find, however, that the evidence clearly and convincingly establishes that respon-

dent's conduct in the *Bauer* matter was unethical (Docket No. DRB 89–077). Hence, the Board disagrees with the committee's conclusion in that matter and recommends the dismissal of that presentment.

The applicable standard of proof by which to measure alleged unethical conduct is that of clear and convincing evidence. *In re Shaw,* 88 *N.J.* 433, 437, 443 *A.*2d 670 (1982); *In re Sears,* 71 *N.J.* 175, 197, 364 *A.*2d 777 (1976); *In re Rockoff,* 66 *N.J.* 394, 396–397, 331 *A.*2d 609 (1975). Any doubts must be resolved in favor of the respondent. *See Application of Jenkins,* 94 *N.J.* 458, 467, 467 *A.*2d 1084 (1983); *In re Matthews,* 94 *N.J.* 59, 78, 462 *A.*2d 165 (1983); *In re Shaw, supra,* 88 *N.J.* at 437, 443 *A.*2d 670.

Indeed, the record does not show to a clear and convincing standard that respondent lacked due diligence in handling the estate or, more specifically, in arranging for the issuance of the stock certificates. To the contrary, the record discloses that respondent took prompt action to obtain new certificates and to comply with the requirements set forth by the transfer agent. Any delay was caused solely by Jannsens' acknowledged lack of urgency in signing the certificates, because of the impossibility of negotiating the stock prior to his grandfather's demise.

Similarly, the evidence fails to show clearly and convincingly that respondent lost or misplaced grievant's and her sister's certificates. The existence of other plausible explanations for grievant's and her sister's late receipt of the new certificates prevents the Board from reaching a conclusion that respondent lacked diligence or failed to safekeep grievant's and her sister's property. Curiously, only grievant's and her sister's certificates were misplaced. Jannsens' were not. It might very well be that, at grievant's request, her certificates and those of her sister were not forwarded to respondent's office, but directly to them. Indeed, on April 10, 1987, the date respondent forwarded the forms to the transfer agent with Jannsens' signature

guaranteed by a commercial bank, grievant and her sister were represented by separate counsel.

The Board is also unable to find that respondent violated *R.P.C.* 1.4. Respondent was retained by Jannsens, the executor, to handle the administration of the estate. Although an attorney's fiduciary duty may extend to individuals other than his or her clients, grievant engaged separate counsel in October 1986. Respondent was under no obligation to communicate with grievant. In fact, respondent was prudent in not communicating with grievant, in light of the fact that she was represented by independent counsel.

Moreover, even assuming, *arguendo*, that respondent had a duty to keep grievant informed of the status of the matter, the evidence does not clearly and convincingly establish that respondent was aware that grievant was seeking to obtain information from him. Respondent testified that he reviewed every message pad in his office: on one occasion only, March 3, 1987, was there a message from grievant for respondent to return her call.

The Board is similarly unable to conclude that respondent did not respond to the requests for information by grievant's attorney. As paragraph 11 of the attorney's affidavit clearly indicates (Exhibit J–7 in evidence), at no time did the attorney encounter any delays in her dealings with respondent about the estate matter.

In view of the foregoing, the Board unanimously recommends that the findings of the committee be reversed and that the presentment in the *Bauer* matter be dismissed. Three members did not participate.

Respondent's conduct in the *Peak* matter, on the other hand, was nothing short of abominable. The Board is convinced that it warrants disbarment.

As detailed in the above factual recapitulation, the irrefutable evidence shows that respondent committed a multitude of grave

ethical offenses by (1) opening mail addressed to his ex-wife for a period of five years or at least 121 times, as stated in the hearing panel report, in violation of *DR* 1–102(A)(3) and (4), and *R.P.C.* 8.4(b) and (c); [6] (2) forging his ex-wife's signature on the credit card applications, in violation of *DR* 1–102(A)(3) and (4), and *R.P.C.* 8.4(b) and (c); (3) supplying false information to the bank, in violation of *DR* 1–102(A)(3) and (4), and *R.P.C.* 8.4(b) and (c); (4) obtaining and using the two credit cards through dishonesty, fraud, deceit and misrepresentation, in violation of *DR* 1–102(A)(3) and (4), and *R.P.C.* 8.4(b) and (c); (5) jeopardizing his ex-wife's creditworthiness, in violation of *R.P.C.* 8.4(c); (6) tampering with a witness in an official proceeding, in violation of *R.P.C.* 8.4(b) and (d); (7) knowingly making false statements of material fact to the committee investigator; more specifically, falsely stating in a letter to the investigator that his ex-wife had knowledge of and had assented to his use of her credit cards, and lying in an affidavit to the investigator that there was no stipulation of settlement between him and his ex-wife, in violation of *R.P.C.* 8.1(a), 8.4(b), (c) and (d); (8) lying in a letter-memorandum and in a certification to the court, in violation of *R.P.C.* 3.3(a), 8.4(b), (c) and (d); and (9) willfully disregarding the Court's imposition of the prior public reprimand, in violation of *R.P.C.* 8.4(d).

Although the complaint also charged respondent with violation of 18 *U.S.C.* § 1703, *N.J.S.A.* 2C:21–1(a)(2) and (3), *N.J.S.A.* 2C:21–6(b), (c) and (d), *N.J.S.A.* 2C:28–5(a)(2) and (3), *N.J.S.A.* 2C:28–1 and 2, the Board need not rest its recommendation for discipline on the fact that, notwithstanding the absence of a criminal conviction, respondent was surely guilty of criminal conduct, for respondent's serious unethical conduct alone is

---

[6]The Rules of Professional Conduct replaced the Disciplinary Rules effective September 10, 1984. Respondent's unethical conduct occurred both before and after that date. Hence, both the DRs and the RPCs apply.

sufficient to warrant disbarment. *See Matter of Edson*, 108 *N.J.* 464, 530 *A.*2d 1246 (1987).

Rarely has this Board encountered such a callous indifference to the truth, such a contemptuous attitude toward the administration of justice, and such a deficiency of moral character. Never has this Board been exposed to greater disdain and defiance to the Court and to the entire disciplinary system. For, as the record reveals, respondent opened and used two new credit card accounts in his former wife's name, in the midst of the ethics proceeding for his unauthorized use of a prior credit card account also in his former wife's name. Egregiously, at the same time that respondent was contritely admitting to the panel that his "experience before the committee had a sobering effect," *Matter of Maurello, supra,* 102 *N.J.* at 634, 510 *A.*2d 36, he was willfully committing over and over again the same ethical violations for which he was crying repentance. More devious conduct is difficult to envision.

It is well established that the primary reason for discipline is not to punish the attorney but to protect the members of the public against attorneys who are unworthy of their trust. In determining the appropriate discipline, it is proper to consider the interests of the public, the bar, and the respondent. *Matter of Kushner,* 101 *N.J.* 397, 400, 502 *A.*2d 32 (1986).

In *Matter of Verdiramo,* 96 *N.J.* 183, 475 *A.*2d 45 (1984), an attorney was convicted of obstruction of justice by attempting to persuade a prospective witness to testify falsely before a grand jury. The Court noted that the case presented special circumstances, such as the attorney's temporary suspension for a period of seven years, the passage of eight years since the ethical violations, and the lack of uniformity in the past in the imposition of discipline for crimes that directly undermined the administration of justice. The Court concluded that disbarment would be more vindictive than just and deemed respondent's seven-year suspension from the practice of law adequate discipline. The Court, however, made it clear that, in the future,

"ethical misconduct ... involving the commission of crimes that directly poison the well of justice [ ] is deserving of severe sanctions and would ordinarily require disbarment." *Id.* at 186, 475 *A.*2d 45 (citing *In re Hughes*, 90 *N.J.* 32, 446 *A.*2d 1208 (1982)).

In *Matter of Kushner, supra,* 101 *N.J.* 397, 502 *A.*2d 32 (1984), the Court suspended for three years an attorney who filed a false certification to induce a court to grant relief for his benefit, an offense that the Court considered a "fundamental breach of a lawyer's duty as an officer of the court." *Id.* at 401, 502 *A.*2d 32. The misconduct in *Kushner* antedated the *Verdiramo* decision.

More recently, the Court imposed a three-year suspension on an attorney who falsely represented, in litigation brought on his own behalf, that a certain handwritten statement had been prepared and signed by his wife, who subsequently died. The attorney's conduct also predated the Court's decision in *Verdiramo. Matter of Lunn,* 118 *N.J.* 163, 570 A.2d 940 (1990).

Here, respondent's actions were more egregious than those in *Kushner* and *Lunn.* The degree of gravity of the offenses is analogous to that found in *Matter of Rigolosi,* 107 *N.J.* 192, 526 *A.*2d 670 (1987), and *Matter of Edson, supra,* 108 *N.J.* 464, 530 *A.*2d 1246 (1987).

In *Rigolosi,* the attorney participated in a scheme to bribe a state trooper into filing a false report. Although the attorney was acquitted of all criminal charges, the Court ordered that he be disbarred because of the mandate contained in *Verdiramo,* and because the Court considered that kind of ethics violation, "... the purposeful, knowing and corrupt subversion of a criminal prosecution [ ] to be *per se* evidence of professional unfitness." *Rigolosi, supra,* 107 *N.J.* at 209, 526 *A.*2d 670.

Similarly, in *Edson, supra,* 108 *N.J.* 464, 530 *A.*2d 1246 (1987), the Court disbarred an attorney who advised two clients to manufacture evidence in the defense of their drunk driving

cases. Like the attorney in *Rigolosi*, respondent Edson had not been criminally convicted. Noting that the absence of a conviction was of no moment and that the attorney's conduct postdated the unmistakable warning given in *Verdiramo*, that ethical misconducts involving crimes that directly affect the administration of justice require disbarment, the Court ordered that the attorney be disbarred. The Court noted that rarely had it found such "shocking disregard of professional standards, the kind of moral arrogance, that is illustrated by this record." *Edson, supra,* 108 *N.J.* at 472–473, 530 *A.*2d 1246.

Here, too, respondent's conduct was outrageous. He repeated the identical, calculated course of conduct for which he was previously publicly reprimanded in 1986. He consciously subverted the administration of justice by lying to the court and to the disciplinary authorities, and by tampering with a witness. He has also shown himself to be a scheming, self-serving liar, with a moral character so deficient that it disqualifies him from the privilege of being a member of the legal profession. The interest of the public and of members of the bar will best be served by his disbarment. The Board unanimously so recommends. Two members did not participate.

The Board further recommends that respondent be required to reimburse the Ethics Financial Committee for administrative costs.

Dated: July 31, 1990.

By: /s/ Raymond R. Trombadore
Raymond R. Trombadore
Chair
Disciplinary Review Board