

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

2-22-1996

# United States v. Maurello

Precedential or Non-Precedential:

Docket 95-5109

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"United States v. Maurello" (1996). *1996 Decisions.* Paper 238.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/238

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

----------

No. 95-5109

----------

UNITED STATES OF AMERICA

v.

ARTHUR MAURELLO,
                    Appellant

----------

On Appeal from the United States District Court
for the District of New Jersey
(D.C. Criminal No. 94-438)

----------

Argued November 20, 1995

BEFORE: BECKER, SAROKIN
and WELLFORD,[2] <u>Circuit</u> <u>Judges</u>

----------

(Opinion filed February 22, 1996)

Brian P. Reilly, Esq. (ARGUED)
Office of Federal Public Defender
22 South Clinton Avenue
Station Plaza #4, 4th Floor
Trenton, NJ  08609

        Attorney for Appellant


Kevin McNulty, Esq. (ARGUED)
Office of United States Attorney
970 Broad Street

---

[2]Honorable Harry W. Wellford, United States Court of Appeals for
        the Sixth Circuit, sitting by designation.


1

Room 502
Newark, NJ  07102

                    Attorney for Appellee
                    ----------

                    OPINION OF THE COURT

                    ----------

SAROKIN, Circuit Judge:


    Defendant, a disbarred lawyer, was convicted of mail fraud
by virtue of his unauthorized practice of law.  The gross amount
of fees he received from his clients was used to calculate the
loss caused by his fraud, and in turn, the sentence to be imposed
under the guidelines.  With some reluctance because of the
conduct involved, we conclude and agree with defendant's
contention that fees paid by those who received satisfactory
services are not to be included in determining the measurement of
loss from his fraudulent scheme.  In addition, we remand to the
district court for factual findings as to whether defendant's
self-professed dissatisfied clients suffered actual financial
loss as a result of his scheme, and if so, in what amount.

    Because defendant utilized his special skills as an attorney
in procuring clients, we conclude that imposing a two-point
upward adjustment for using a special skill in the commission of
the offense was warranted.

    Finally, we vacate and remand with respect to the
restitution imposed for the reasons hereinafter set forth.

    After pleading guilty to mail fraud and credit card fraud,
defendant was sentenced pursuant to the Federal Sentencing

2

Guidelines to two concurrent prison terms of thirty-six months each, to be followed by three years of supervised release. In addition, he was ordered to pay $25,000 in restitution on each charge. The issues presented for review are threefold: 1) whether the district court properly calculated the amount of loss caused by defendant's mail fraud for purposes of guideline § 2F1.1; 2) whether the district court erred in imposing a two-point upward adjustment to defendant's base offense level on the ground that he abused a position of trust and/or used a special skill to significantly facilitate the commission or concealment of either offense; and 3) whether the district court erred in ordering defendant to pay $50,000 restitution ($25,000 on each count). We will affirm in part, reverse in part, and remand in part to the district court for further findings of fact.

## I.

### A. Mail Fraud

Arthur Maurello was admitted to the New Jersey State Bar in 1976. From 1976 to 1990, he practiced as a licensed solo practitioner. In 1988, however, an ethics complaint was filed against him. The Disciplinary Review Board conducted an investigation and found that Mr. Maurello had, among other things, fraudulently obtained credit cards in the name of his former wife and tampered with a witness in the course of the ethics investigation. In re Maurello, 121 N.J. 466, 478-79 (1990). As a result, on October 26, 1990, Mr. Maurello was permanently disbarred by the New Jersey Supreme Court. Id.

3

In 1989, apparently in anticipation of his possible disbarment, defendant took steps to set up a law practice under an assumed name. From the New Jersey Lawyer's Diary, defendant selected the names of two members of the New Jersey Bar who no longer practiced law: Robert Burdette and Alan Jeffrey Miller. Although the facts are not clear from the record, it appears that defendant acquired personal information about Burdette by "simple inquiry to the Bar," and about Miller by calling a toll-free information line provided to the public by the California Bar. Defendant used this information to obtain driver's licenses, credit cards and social security cards under the assumed names.

In 1989, defendant briefly established a law practice entitled "Bell and Burdette." It is unclear whether or to what extent he actually practiced under this name. He then reactivated Miller's license to practice law, establishing a law firm under the name "Alan Jeffrey Miller Chartered" in 1990. He hired staff and associates, and provided legal services to hundreds of clients.

## B. Credit Card Fraud

From 1988 until December 1991, defendant engaged in a scheme to commit credit card fraud. Drawing on biographical information gleaned from obituaries, he obtained birth certificates, death certificates, and other information on at least twelve different individuals[3] from public records. He then ran credit checks and

---

[3]The Presentence Investigation Report alleges that appellant obtained credit cards in the names of approximately twenty-eight different people. Appellant contends that the correct number is

4

obtained driver's licenses under the assumed names. Finally, he applied for and received credit cards, on which he charged approximately $230,000 worth of merchandise.

## II.

In 1994, a U.S. Postal Inspector filed a criminal complaint in the District of New Jersey which charged that defendant committed mail fraud in connection with his unauthorized law practice. Defendant waived indictment in open court, and a six-count Information was filed against him. The Information charged defendant with five counts of mail fraud in violation of 18 U.S.C. §§ 1341 and 1342 and one count of credit card fraud in violation of 18 U.S.C. §§ 1029 and 1022.

Defendant pled guilty to Count 1 (mail fraud) and Count 6 (credit card fraud). The district court sentenced him as stated above.

## III. Jurisdiction

The district court had jurisdiction pursuant to 18 U.S.C. §3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. 3742.

## IV. Standard of Review

Our review of the district court's interpretation of "loss" for purposes of § 2F1.1 is plenary. United States v. Badaracco, 954 F.2d 928 (3d Cir. 1992).

The appropriate standard of review of a district court's decision regarding the applicability of an adjustment under the

---

twelve. The court accepted the lower number for sentencing purposes.

5

Guidelines "depends on the mixture of fact and law necessary to that court's determination." United States v. Bierley, 922 F.2d 1061, 1064 (3d Cir. 1990). If the decision is "essentially factual," we apply a clearly erroneous standard. Id. If the claimed error is legal, however, we review the district court's decision de novo. Id.

We review a district court's restitution order under a bifurcated standard: plenary review as to whether restitution is permitted by law, and abuse of discretion as to the appropriateness of the particular award. United States v. Hunter, 52 F.3d 489, 492 (3d Cir. 1995).

## IV. Discussion

### A. Loss Calculation on Mail Fraud Count

Defendant was sentenced pursuant to § 2F1.1 of the Federal Sentencing Guidelines, which governs sentencing for fraud. Under that guideline, the offense level for sentencing purposes is based in part on the amount of "loss" due to the fraud, with higher losses resulting in higher sentences. The issue here is whether money paid by clients for apparently satisfactory legal services performed by an unlicensed attorney is considered part of the "loss" from the attorney's fraudulent acts for purposes of § 2F1.1.

The Presentence Investigation Report ("PSR") took the position that only fees paid by dissatisfied clients should be considered in calculating loss. To compute the monetary loss from the mail fraud, the probation office sent letters to all known clients of defendant's unauthorized practice, inquiring

6

whether they considered themselves victims or believed themselves entitled to restitution. From approximately 225 letters, the probation office received ninety-seven responses. Seventy of those who responded expressed satisfaction with defendant's services, while twenty-seven stated that they were dissatisfied with the legal services they received and requested their money back. The fees paid by those twenty-seven persons totalled approximately $62,000. The probation office recommended that figure to the court as the total loss from defendant's unlicensed practice.

At the sentencing hearing, both sides challenged the PSR's loss computation. Defendant argued that loss should be zero, because his clients received the legal services for which they paid. The government, on the other hand, argued that the loss should include the gross total of all fees paid to defendant during the period of his illegitimate practice, on the theory that none of defendant's clients received that for which they had paid: the services of a licensed attorney.

The district court accepted the government's argument, reasoning that "[n]o client would have paid any money had he or she known the defendant assumed the identity of another person, did not have a license to practice law." App. 598. The court concluded that since all of the clients "paid . . . the defendant for something the defendant could never provide . . . , every dollar that they paid was a loss." Id. Adding together all of the fees received by the firm, less those fees paid to

7

defendant's partner, the court calculated the total loss from defendant's mail fraud scheme to be $428,902.

## 1.

In determining the way in which loss should properly be measured in this case, we look first to the Guidelines and Commentary thereto. The Commentary to § 2F1.1 defines loss as "the value of the money, property, or services unlawfully taken." Commentary, App. Note 7. The loss calculation need not be precise; the guidelines require only a "reasonable estimate" based on the information available. Id. at Note 8.

> This estimate, for example, may be based on the approximate number of victims and an estimate of the average loss to each victim, or on more general factors, such as the nature and duration of the fraud and the revenues generated by similar operations. The offender's gain from committing the fraud is an alternative estimate that ordinarily will underestimate the loss.

Id.

The Commentary to § 2F1.1 then refers the reader to the Commentary to § 2B1.1 for a fuller discussion of loss valuation. Section 2B1.1 is the guideline for larceny, embezzlement, and theft. The Commentary to § 2B1.1 emphasizes the amount taken from the victims as the primary measure of loss: "The value of the property stolen plays an important role in determining sentences for theft and other offenses involving stolen property because it is an indicator of both the harm to the victim and the gain to the defendant." § 2B1.1, Background, ¶ 1.

Although the fraud guideline's cross-reference to the theft guideline suggests that the same measurement of loss--amount

taken--should be used in both cases, this court has "decline[d] to impose an identical [loss valuation] analysis for theft and fraud crimes in all cases." United States v. Kopp, 951 F.2d 521, 529 (3d Cir. 1991). Because our analysis in Kopp is crucial to an understanding of subsequent Third Circuit case law, we will discuss it in some detail.

At the outset, we looked to the legislative purpose behind the guidelines. We reasoned that

> [m]echanical application of the theft guideline in fraud cases would frustrate the legislative purpose of the guidelines and contravene the specific language of the Commission. The sentencing guideline system was designed to sentence similarly situated defendants similarly; basing all fraud sentences on a simple 'amount taken' rule without regard to actual or intended harm would contravene that purpose.

Id. (emphasis added). It is important to note that, while 'amount taken' and 'actual harm' are often the same thing, there are circumstances in which the amount taken from the victims understates or overstates the actual harm done--for example, when the perpetrator returns to the victims all or part of that which was actually taken from them, thus reducing their actual loss without altering the amount originally taken. Because the potential for amount taken to misstate loss is greater in fraud cases, which are generally not based on a straightforward taking of property, we concluded our legislative purpose analysis by stating that "we think it plain that actual harm is generally relevant to the proper sentence" for fraud. Id.

Next, we stated that "a detailed analysis of the *entire* fraud guideline Commentary" supports our conclusion. Id. We

9

reasoned that the language of the cross-reference itself "does not say that the definitions of 'loss' for theft and fraud crimes are identical, just that '[v]aluation of loss *is discussed* in the Commentary to §2B1.1 . . . .'" Id. Whereas the theft guideline simply makes amount taken from the victim the preferred measure of loss, we noted that the fraud guideline requires a "slightly . . . more complicated" analysis: (1) actual loss is the baseline measure for fraud, but (2) if either "probable" or "intended" loss is reasonably calculable and higher than actual loss, then it should be used instead. Id. (citing Commentary to § 2F1.1, App. Note 7).[4] We therefore concluded that (1) the fraud guideline defines loss primarily as "the amount of money the victim has <u>actually lost</u> (estimated at the time of sentencing), not the potential loss as measured at the time of the crime," Kopp, 951 F.2d at 536 (emphasis added); and (2) "the 'loss' should be revised upward to the loss that the defendant intended to inflict, if that amount is higher than actual loss." Id.

We noted that this conclusion was "essentially consistent" with the fraud guideline's cross-reference to the theft guideline with respect to loss valuation. 951 F.2d at 529. We reasoned that "*[i]n both theft and fraud cases, the guideline 'loss' turns out to be the higher of the actual loss and the intended loss*." Id.

---

[4]The current version of Application Note 7 does not mention "probable" loss. It reads as follows: "Consistent with the provisions of § 2X1.1 (Attempt, Solicitation or Conspiracy), if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss."

10

We acknowledged, however, that "our reconciliation of U.S.S.G. §§ 2B1.1 and 2F1.1 might fail" in the case of embezzlement.  951 F.2d 530 n.13.

> Conceivably, an embezzler might secret away $10,000 in office funds to invest in a reputable stock, truly intending and hoping to return the amount taken (plus interest) after selling the stock.  Under a literal reading of U.S.S.G. § 2B1.1, "loss" is the "amount taken," $10,000 in our example.  In that case intended loss would be zero, and actual loss might also be zero.  But if U.S.S.G. § 2F1.1 applied (it would not), under our interpretation "loss" would be zero, and no sentence enhancement would apply.

951 F.2d at 530 n.13.  To address this potential inconsistency, we suggested that "embezzlement, unlike ordinary theft or fraud, involves not only a taking but also an action akin to a breach of fiduciary duty, which might justify always using the amount taken as 'loss.'"  Id.

This language formed the basis of our holding the following year in United States v. Badaracco, 954 F.2d 928 (3d Cir. 1992).  In Badaracco, we revisited the issue of loss valuation under the fraud guidelines and restricted the scope of Kopp.  Badaracco involved the president and CEO of a bank who had approved loans to certain developers on the condition that they award electrical subcontracts to companies in which he had an interest.  The district court, ruling prior to our decision in Kopp, computed loss for purposes of § 2F1.1 by adding together the face values of the fraudulently induced contracts.

During the pendency of the appeal, Kopp was issued.  We ruled in Badaracco, however, that Kopp did not require us to

11

compute loss on the basis of actual loss in that case. Badaracco, 954 F.2d at 937. Restricting the scope of the rule articulated in Kopp, we stated that "the sentencing judge is entitled, probably compelled, to evaluate the size of the loss based on the particular offense." Id. Then, relying on the dicta in Kopp regarding embezzlement, we held that "[w]hen the officer of a financial institution uses his or her position for personal benefit, there is a breach of fiduciary duty comparable to that implicated by embezzlement, which may justify using the 'gross gain' alternative to estimate 'loss.'" Id. at 938. We concluded that gross gain was the appropriate measure of loss in Badaracco. Id. at 938.

Since defendant's fraud in this case involved a breach of fiduciary duty, the government contends that Badaracco governs and therefore that the appropriate measure of loss is defendant's "gross gain." Appellee's Br. at 22. We disagree, for two reasons.

First, the government's interpretation of Badaracco sweeps far too broadly. As discussed above, we did not hold that gross gain is the measure to apply in every fraud case involving a breach of fiduciary duty; rather, we held that "a breach of fiduciary duty comparable to that implicated by embezzlement . . . may justify using the 'gross gain' alternative to estimate 'loss.'" Badaracco, 954 F.2d at 938. Defendant's mail fraud scheme is not sufficiently analogous to embezzlement to justify using gross gain as the measure of loss. In embezzlement, breach of fiduciary duty is an inherent element of the crime. Kopp, 951

12

F.2d at 530 n.13. Similarly, in the bank fraud provision underlying Badaracco, as written and as applied in that case, breach of fiduciary duty is implicitly an element.[5] Under both crimes, the defendant has rightful possession of or control over money, which he fraudulently diverts to his own purposes by breaching his fiduciary responsibility to the money's rightful owner.

In this case, however, defendant was charged with mail fraud pursuant to 18 U.S.C. § 1341. The gravamen of his offense is the use of the mails to further a fraudulent purpose. Defendant did not fraudulently convert money over which he had possession or control; rather, he fraudulently induced people to enter into contracts pursuant to which they gave him money in exchange for services. The mere fact that defendant's scheme involved a breach of fiduciary duty does not bring it under the penumbra of Badaracco.

Second, even if we agreed with the government's analogy, we would reject their argument that "gross gain" to the defendant is the appropriate measure of loss under Badaracco because the portion of the fraud guideline on which that holding was based

_____

[5]18 U.S.C. § 1006, excerpted in Badaracco, provides as follows:
Whoever, being an officer . . . [of] any lending, mortgage, insurance, credit or savings and loan corporation or association authorized or acting under the laws of the United States . . . with intent to defraud any such institution . . . participates or shares in or receives directly or indirectly any money, profit, property, or benefits through any transaction, loan commission, contract, or any other act of any such corporation, institution, or association, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

13

has been amended.  In <u>Badaracco</u>, we held that the analogy to embezzlement justified our "using the 'gross gain' alternative to estimate 'loss,' expressly authorized in Application Note 8." <u>Badaracco</u>, 954 F.2d at 938.  In 1991, however, Application Note 8 was amended, deleting "offender's gross gain" and substituting "offender's gain." <u>See</u> § 2F1.1, Note 8.  We noted this change in <u>Badaracco</u>, but stated that "[b]ecause we do not remand on this issue, we need not consider the effect of this change in subsequent sentencings." <u>Badaracco</u>, 954 F.2d at 938 n.11. Defendant in this case was sentenced on January 31, 1995--nearly four years after this amendment took effect.  Although we do not need to reach this issue in this case, it seems clear that the guidelines no longer endorse "gross gain" to the defendant as an alternative measure of loss.

As a result, pursuant to the mandate of the guidelines and the reasoning of our decision in <u>Kopp</u>, we conclude that actual loss is the appropriate basis for loss measurement in this case.

**2.**

We now turn to the task of determining the appropriate measurement of actual loss under the facts of this case.  The government contends, and the district court found, that every dollar paid to defendant during his illegitimate practice was a dollar lost, because "the true market value of the services provided by defendant Maurello was zero." Appellee's Br. at 19. The government asserts that "[l]egal representation by a non-lawyer is worth nothing in the marketplace; it is a commodity that cannot be sold, as a matter of law." <u>Id.</u>

14

This argument ignores reality.  A client who obtains a satisfactory contract, settlement, or verdict has received something of value, irrespective of whether the lawyer was licensed at the time.  The services rendered do not become worthless if the client later learns that the attorney was not licensed to practice when the services were performed.  If the validity of the services could later be attacked on the ground that they were performed by an attorney who had been disbarred, then the government's argument might have merit; however, there is no such allegation in this case.

Furthermore, the government's argument contravenes the clearly expressed policy of the guidelines.  Congress instructed the Sentencing Commission to take the "nature and degree of the harm caused by the offense" into account in drafting the guidelines.  28 U.S.C. § 994(c)(3).  Thus, the policy statement at the opening of the guideline manual states that the guidelines are designed to serve two sentencing purposes: "just deserts" and "crime control." Guidelines Ch. 1, Part A, § 3.  Under the theory of just deserts, according to the policy statement, "punishment should be scaled to the offender's culpability and the resulting harms."  Id.

More importantly for our purposes, section 1B1.3, entitled "Relevant Conduct," states that "specific offense characteristics" shall be determined on the basis of, inter alia, "all harm that resulted from the acts and omissions . . . [of the defendant], and all harm that was the object of such acts and omissions."  §1B1.3(a)(3).  Section 2F1.1 clearly designates the

15

amount of loss from fraud as a specific offense characteristic. § 2F1.1(b)(1); see also § 2B1.1(b)(1)(designating amount of loss from theft as a specific offense characteristic). It follows that the degree of harm caused by defendant's acts is relevant to the determination of loss. See also Commentary to § 2B1.1, Background ¶ 1 ("The value of the property stolen plays an important role in determining sentences . . . because it is an indicator of both the harm to the victim and the gain to the defendant."); id. at application note 2 ("Where the market value is difficult to ascertain or inadequate to measure harm to the victim, the court may measure loss in some other way, such as reasonable replacement cost to the victim.")(emphasis added).

The district court in this case rejected actual harm to the victims as a means of measuring loss on the ground that such an approach would put the court

> in the anomalous position of slapping the wrist of the competent malefactor and harshly sanctioning the incompetent one when both are equally culpable because the crime lies in the fact of their misrepresentation, not the nature and quality of the representation of their clients.

App. 59. The court concluded that "assessing the quality of the services offered by the unlicensed attorney . . . is not the purpose of the calculation for determining amount of loss." Id. at 609.

For the reasons just stated, we believe this argument misconstrues the theory of the guidelines and the nature and purpose of the loss measurement. The quality of services rendered is directly relevant to the degree of harm caused by

16

defendant's actions. Under the theory advanced by the district court, an unlicensed attorney who represents 100 people, earning $200,000 in fees and obtaining spectacular results for all of them, would receive the same punishment as one who represents the same number of clients incompetently and to their detriment but receives the same amount in fees. A theory that yields such a perverse result is "simple, but irrational." Kopp, 951 F.2d at 532. We simply cannot agree with the district court's assertion that two defendants so situated are "equally culpable."

We wish to make clear that we are neither rewarding nor condoning the unauthorized practice of law. The issue here is not whether or not defendant will be punished for his conduct, but rather whether his base offense level will be enhanced on account of loss caused by his fraud. To the extent that the unauthorized services provided by defendant have not harmed their recipients, but to the contrary have benefitted them, we conclude that defendant's base offense level should not be enhanced. A person who hires a contractor to construct a building according to certain specifications, for example, and receives a flawless and structurally sound building as a result of the bargain, cannot be said to have suffered a loss simply because he later learns that the contractor was not licensed at the time of construction. In those circumstances, the victim has sustained no loss because he has received the services for which he bargained, despite the fact that he has received them from a person who was not legally authorized to offer them. For

17

defendant's conduct in practicing without a license he should be and has been punished.

The Seventh Circuit's decision in <u>United States v. Schneider</u>, 930 F.2d 555 (7th Cir. 1991), supports our conclusion. In deciding the appropriate measure of loss from fraudulently induced construction contracts that were terminated before the intended victim paid any money, Judge Posner reasoned that

> it is necessary to distinguish between two types of fraud. One is where the offender--a true con artist . . . --does not intend to perform his undertaking, the contract or whatever; he means to pocket the entire contract price without rendering any service in return. In such a case the contract price is a reasonable estimate of what we are calling the expected loss, and we repeat that no more than a reasonable estimate is required. The other type of fraud is committed in order to obtain a contract that the defendant might otherwise not obtain, but he means to perform the contract (and is able to do so) and to pocket, as the profit from the fraud, only the difference between the contract price and his costs.

<u>Id.</u> at 558. Stating that the estimate of loss pursuant to § 2F1.1 must bear some relation to "economic reality," <u>id.</u> at 559, the Seventh Circuit ruled that the fraud committed in <u>Schneider</u> was of the latter type. Because there was no reason to believe that the defendants would not have performed the contracts "to the perfect satisfaction of the contracting agency," the court rejected gross gain to the defendants as the appropriate measure of loss. <u>Id.</u> at 558. We endorsed this reasoning in <u>Kopp</u>, and we do so again today.

**3.**

The government argues in the alternative that the loss from defendant's fraud should be measured in terms of the total money

18

paid to defendant because that money "was diverted from defendant's legitimate competitors." We reject this argument for the same reason we rejected the district court's measurement of actual loss: it eliminates any meaningful correlation between severity of punishment and degree of harm caused, and it measures the loss to those who are not direct victims of the defendant's conduct. For every fraud in the sale of goods or services, there is someone who could have sold the same goods or delivered the same services as promised or represented, but they are but distant and remote victims of such fraudulent conduct. It is not their loss which should provide the measure, but rather the direct victims of defendant's conduct. Every person who commits the type of fraud for which defendant stands convicted can be said to have diverted money from legitimate competitors. Thus, under this theory, the measure of loss in this type of case would always be equal to the total fees paid to defendant, regardless of the actual harm to the victims. This would render the degree of harm caused by a defendant's acts irrelevant to Guideline sentencing--a result that is contrary to the policy of the Guidelines as discussed above.

**4.**

Having rejected the measure of fraud loss employed by the district court, we must determine an appropriate substitute. For purposes of § 2F1.1, "the loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information." Commentary to § 2F1.1, App. Note 8.

We take as our starting place the probation office's proposal that actual harm be measured by the total amount of fees paid by dissatisfied clients. Because this method seeks to identify those clients who were actually harmed by defendant's actions, it is a good starting place for measuring loss. It does not provide a "reasonable estimate" standing alone, however, because unsubstantiated complaints voiced by clients only after they have learned of defendant's wrongdoing and their possible right to restitution are unreliable at best, and inherently suspect. In order to render the probation office's estimate a reasonable one for purposes of § 2F1.1, we hold that the government must demonstrate and the district court must find that the complaints on which it is based are bona fide and can reasonably support a loss determination. We therefore remand to the district court for the purpose of determining whether the twenty-seven complaints underlying the probation office's loss estimate bear a reasonable relationship to actual or intended loss. The district court is not required to determine whether each complainant has a grievance that could support a malpractice determination, but merely whether the complainant's claimed loss has a reasonable basis in fact so that the court is convinced that the complainant did not respond to the government's inquiry merely in the hope of procuring a financial windfall.

Our conclusion that the district court overvalued fraud loss under the circumstances is by no means an indication that the district court overestimated the seriousness of the underlying conduct. Section 2F1.1 provides that "[i]n cases in which the

20

loss determined under subsection (b)(1) does not fully capture the harmfulness and seriousness of the conduct, an upward departure may be warranted." § 2F1.1. In this case, as in Kopp, the district court is free to reconsider on remand "whether the properly calculated 'loss' significantly over- or understates the gravity of the crime, and therefore whether departure from the normal sentencing range is appropriate." Kopp, 951 F.2d at 536.

## B. Abuse of a Position of Trust or Use of Special Skill

The district court imposed a two-point upward adjustment pursuant to § 3B1.3 for abuse of a position of trust or use of a special skill. Section 3B1.3 provides: "If the defendant abused a position of public or private trust, or used a special skill, in a manner that significantly facilitated the commission or concealment of the offense, increase by 2 levels." § 3B1.3. The district court found that defendant had abused a position of trust in connection with the mail fraud, and that he had used a special skill in the commission of both the mail fraud and the credit card fraud. As either abuse of a position of trust or use of a special skill standing alone is a sufficient basis for an upward adjustment, we must uphold the district court's determination if any one of these three grounds was proper.

## 1. Use of a Special Skill

We begin by addressing the district court's finding that defendant used a special skill in the commission of both offenses. The Commentary to § 3B1.3 describes the enhancement for use of a special skill in the commission of an offense as follows:

21

> "Special skill" refers to a skill not possessed by members of the general public and usually requiring substantial education, training or licensing. Examples would include pilots, lawyers, doctors, accountants, chemists, and demolition experts.

Application Note 2. Like the enhancement for abuse of a position of trust, this adjustment "applies to persons who abuse . . . their special skills to facilitate significantly the commission or concealment of a crime." Background to § 3B1.3.

### a. Mail Fraud

### i.

To impose an upward adjustment for use of a special skill pursuant to § 3B1.3, a court must find two things: (1) that defendant possesses a special skill; and (2) that he used it to significantly facilitate the commission or concealment of his offense. United States v. Hickman, 991 F.2d 1110, 1112 (3d Cir. 1993). In this case, the district court neither made specific findings of fact nor articulated reasons in support of its conclusion that defendant used a special skill in perpetrating the mail fraud scheme. As a result, we must determine whether the record as a whole "demonstrates" the manner in which defendant used his special skill to facilitate the commission or concealment of the offense. United States v. Rice, 52 F.3d 843, 850 (10th Cir. 1985); United States v. Gandy, 36 F.3d 912, 916 (10th Cir. 1994). If the record as a whole supports the district court's enhancement of defendant's sentence for use of a special skill in the commission of the mail fraud offense, then we need

not remand for specific factual findings in support of the enhancement. Id.

We begin with the first prong of the § 3B1.3 inquiry: whether defendant possesses a special skill within the meaning of the guideline. The court appears to have found that defendant's "special skill is [not] the practice of law per se, but rather is the knowledge that one obtains through a legal education and prior practice." App. 580; see also Govt's Br. at 44 ("[T]he special skill adjustment rested on the whole panoply of practical skills associated with a legal career."). We note at the outset that defendant's legal training clearly constitutes a special skill, as lawyering is specifically listed as an example of a special skill in the text of the Guideline. Moreover, under the circumstances, we believe that including defendant's experiences and general knowledge acquired over the course of his legal career within the contours of his special skill is warranted. See United States v. Culver, 929 F.2d 389 (8th Cir. 1991)(finding use of special skill where pilot convicted of conspiracy to transport stolen aircraft had used his skills to plan for fuel and devise flight plans, despite arrest before take-off); United States v. White, 972 F.2d 590, 600-01, cert. denied, 113 S. Ct. 1651 (1993), cert. denied sub nom Wilson v. United States, id. (finding use of special skill where defense attorney specializing in drug cases used knowledge acquired as a prosecutor and defense lawyer to avoid surveillance during drug conspiracy activities).

23

The district court's decision with respect to the second part of the inquiry--whether defendant used his special skill to significantly facilitate the mail fraud--is a question of fact that we review for clear error. The factual basis of the district court's finding is not clear from the record. The government's argument, which presumably the court adopted, is that defendant "used his special legal skills" in "ascertaining the names of inactive lawyers or obtaining their credit histories for the purpose of assuming their identities." Govt. Br. at 38. According to the government's Sentencing Memorandum, which was part of the record at the time of sentencing, the defendant's

> education and experiences as a licensed attorney enabled him to successfully portray himself to his clients, adversaries, and the courts as a knowledgeable attorney. By using these skills, he was able to conceal the truth about his identity and his unlicensed status and enabled him [sic] to dupe more people into hiring him under the false impression that he was licensed to practice law. In short, he used his previous experience, education, and training to perpetuate the fraud and to conceal it.

App. 548.

We note that this case presents a rather unique situation insofar as the very use of the special skill (legal competence) mitigated the severity of the offense by avoiding harm to victims. Nevertheless, the fact remains that defendant was an experienced lawyer with experience in setting up a law practice and soliciting clients, that these skills are not possessed by the general public, and that he used these skills to facilitate his fraudulent scheme and to avoid detection. The district

24

court's decision to adjust defendant's sentence upwardly for use of a special skill was not clearly erroneous.

**ii.**

Defendant argues that enhancing his sentence for use of a special skill pursuant to § 3B1.3 while also imposing an upward adjustment under § 2F1.1(b)(3)(B) constitutes impermissible double counting. Guideline § 2F1.1(b)(3)(B) provides for a two-level increase in offense level if the offense involved "violation of any judicial or administrative order." Id. Since defendant's unlicensed practice was a direct violation of the New Jersey Supreme Court order of disbarment, the district court enhanced his sentence pursuant to § 2F1.1(b)(3)(B). Defendant apparently does not challenge this enhancement, but rather uses it as the basis for his challenge to the § 3B1.3 adjustment for use of a special skill in connection with his mail fraud scheme. The theory behind his argument is that both enhancements punish the same behavior: the practice of law.

In United States v. Wong, 3 F.3d 667 (3d Cir. 1993), we addressed the issue of double counting under the guidelines. Defendant in that case challenged the simultaneous imposition of upward adjustments for more than minimal planning under §2B1.1(b)(5) and for acting as an organizer or leader of a criminal enterprise under § 3B1.1(c). We reasoned that "because the Guidelines are explicit when two Sentencing Guideline sections may not be applied at the same time, the principle of statutory construction, 'expressio unius est exclusio alterius,' applies." Id. at 670-71. We concluded that "an adjustment that

25

clearly applies to the conduct of an offense must be imposed unless the Guidelines exclude its applicability." Id. at 671.

That reasoning applies with equal force here. Nothing in the Guidelines indicates that § 3B1.3 and § 2F1.1(b)(3)(B) may not be applied in tandem. We therefore reject defendant's double counting argument.

We note that even in the absence of governing legal precedent, we would reject defendant's argument on purely logical grounds. Contrary to his assertions, the enhancements under § 2F1.1(b)(3)(B) and § 3B1.3 do not "dr[a]w from the same well." United States v. Kopshever, 6 F.3d 1218, 1224 (7th Cir. 1993). On the contrary, neither one punishes the practice of law per se. The former punishes defendant's flagrant violation of a judicial order; the latter, his use of the panoply of skills associated with legal practice to facilitate passing himself off as a licensed attorney. "[E]ven if there is some overlap in the factual basis for two or more sentencing adjustments, so long as there is sufficient factual basis for each they may both be applied." United States v. Haines, 32 F.3d 290, 293-93 (7th Cir. 1994). Despite the slight overlap between these two provisions as applied in this case, they target different behavior. As a result, even if the law forbade double counting in the absence of explicit instructions in the guidelines, the simultaneous application of these two enhancement provisions would not constitute double counting.

**iii.**

26

Because we have concluded that the district court properly imposed a two-point upward adjustment for use of a special skill in the commission of the mail fraud offense, we need not and do not reach the issues of whether defendant used a special skill in the commission of the credit card fraud or abused a position of trust within the meaning of the guidelines.

## C. Restitution

Under the Victim and Witness Protection Act, which is incorporated into the Guidelines by § 5E1.1, a district court sentencing a defendant convicted of an offense under Title 18 "may order . . . that the defendant make restitution to any victim of such offense." 18 U.S.C. § 3663(a)(1). In determining

> whether to order restitution and setting the amount, the court shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

18 U.S.C. § 3664(a). In this circuit, the sentencing court must make specific factual findings as to the amount of loss sustained by the victims, the defendant's ability to pay, and the relationship between the amount of restitution ordered and the loss caused by defendant's offense. United States v. Graham, 1995 WL 744974, *3 (3d Cir. 1995); United States v. Logar, 975 F.2d 958, 961 (3d Cir. 1992).

In this case, the district court ordered defendant to pay $25,000 in restitution on the mail fraud counts and $25,000 on the credit card fraud count. Counsel for both sides briefly

addressed the issue of defendant's resources and his ability to pay. Defense counsel argued that defendant has "no resources" and owes $170,000 in state and federal taxes, App. 646-48, and expressed doubt that "restitution is actually feasible in this case." App. 648. The prosecutor then argued, without going into greater detail, that "the sum total that we know about the defendant's assets are set forth in paragraph 134 of the presentence report." App. 649. Although she did not address restitution on the mail fraud counts, she concluded by acknowledging: "Obviously I don't believe there is going to be enough to repay all the credit card companies that suffered an injury . . . ." App. 649.

The only factual information in the record regarding defendant's financial resources and ability to pay is found in the PSR. The PSR lists defendant's assets as follows: a condominium valued at $110,000; $18,000 in a money market account; a few hundred dollars in a checking account; $70 in a savings account; and automobiles valued at $2500. PSR ¶ 134. The PSR reports that defendant and his wife owe $12,800 on their credit cards (not including the fraudulent credit card activity). Id. at ¶ 135. Defendant's wife's income of $1741 per month is the only income to the household and is insufficient to cover their monthly expenses of $1992. Id. at 136. The PSR concludes that defendant "is capable of maintaining steady employment . . . [and] paying partial restitution." Id. at ¶ 137.

28

None of these factual allegations is undisputed. Defendant challenged virtually all of them in his sentencing memorandum.

> Contrary to the PSR's assessment, defendant maintains that he has no assets. His wife's assets are separately and individually held. All purchases were made by Ms. Rzeczyeki and were accumulated through her own earnings. All assets listed except the I.R.A. are the defendant's wife's, not his. Reference to these separate assets should be excised. The I.R.A. was the property of the defendant, but was liquidated following the defendant's arrest and used to pay living expenses for the past ten (10) months. Thus, the defendant has no assets.

App. 54. In addition, defendant challenges the PSR's assessment of his future earning potential and ability to pay:

> Mr. Maurello has no assets. Upon release from custody, financial resources will remain limited. This is especially true since his tax returns have been filed pursuant to the plea agreement, and [he] is obligated to pay the resulting liabilities. He owes money to the Internal Revenue Service which includes tax liability, interest and penalties which, all totalled, are more than $170,000.

Id.

"Where a defendant alleges any factual inaccuracy in the presentence report, the Court must make: (1) a finding as to the allegation, or (2) a determination that no such finding is necessary because the matter controverted will not be taken into account in sentencing." United States v. Cherry, 10 F.3d 1003, 1013 (3d Cir. 1993). Here, in response to this cursory and conflicting testimony, the court stated as follows:

> Well, the defendant's varied and extensive crimes set forth in the presentence report have left a financial mess and a substantial amount of loss to a diverse variety of victims and limited resources to repay.

> I don't want to deprecate the loss of the defendant's in any way. On the other hand, I don't want to set an amount of restitution which is unlikely to ever be repaid. This is a very difficult undertaking.
>
> We know who is to get the money. What we don't know is how much to order that they be given. The amount of loss is substantial, as we know. The defendant is never going to pay back a good portion of it.
>
> Without derogating in any way any efforts that the victims may take on their own to collect, I will limit restitution to $50,000 . . . on each count in lieu of any fine.

App. 650.

It is apparent from this excerpt that the district court failed to make the findings of fact required by our decisions in Cherry and Logar. First, the court made no finding regarding defendant's ability to pay. While the Victim and Witness Protection Act provides that "[t]he burden of demonstrating the financial resources of the defendant and the financial needs of the defendant's dependents shall be on the defendant," 18 U.S.C. §3664(d), the court cannot impose restitution without making specific findings of fact in this regard. Defendant asserts (1) that he owes $170,000 in back taxes, (2) that those taxes are subject to collection by levy upon his wages, (3) that he has never earned more than $25,000 per year in any job, and (4) that the most he will take home following deduction of back taxes by the IRS is $161.54 per week. Appellant's Br. at 37-38. If these assertions are correct, then defendant will not even earn $50,000 over the course of three years, much less be able to pay that amount in restitution. The court's only mention of defendant's ability to pay was the pro forma statement that "I don't mean to

30

deprecate the defendant's crimes by setting the amount of $50,000, but merely to try to, as the Guidelines tell us, try to equate the restitution obligation with the defendant's ability to pay as he may be able to obtain monies in the future." App. 651.

Moreover, the district court failed to make an express factual finding in the restitution context regarding the relationship between the claimed losses to victims and defendant's offense conduct. It may be the case that the district court relied on its earlier finding in the fraud loss context that all clients were victims and all fees paid were losses. Because these losses would not necessarily be subject to restitution, however, the district court erred in not making a specific finding for purposes of restitution. More importantly, even if the court had made a specific finding that all fees paid to defendant were losses related to his offense, that finding would be clearly erroneous in light of our holding in Part VA of this opinion. As discussed above, insofar as defendant's clients were satisfied with his services, the fees that they paid in exchange for those services cannot be considered losses.

While the district court's award of restitution on the credit card fraud count is somewhat less problematic, insofar as the victims of that fraud and the amount that each is owed is clearly established, the district court's failure to make a specific finding as to defendant's ability to pay requires remand on this issue as well.

We therefore remand to the district court for factual findings in support of the restitution order. This is especially

31

appropriate in light of our ruling today that the appropriate measure of loss was not the total of all fees paid to the illegitimate practice ($428,902), but rather the fees paid by those clients who were justifiably dissatisfied (approximately $62,000 if existing complaints are verified). Thus, one of the key factors that the district court should have considered in setting the amount of restitution was inflated to nearly seven times its correct value.

Furthermore, we do not require that the district court make a separate finding as to the amount of restitution due to each victim. The court may establish a formula and authorize the Probation Office, not the U.S. Attorney, to apply it. The parties might also stipulate to the identity and amounts to be paid subject to court approval. However, we specifically express our view that the Probation Department rather than the U.S. Attorney is the proper agency to carry out such functions.

## VI. Conclusion

For the foregoing reasons, we will (1) reverse the district court's fraud loss valuation and remand to the district court for factfinding and resentencing consistent with this opinion; (2) affirm the district court's imposition of a two-point upward adjustment for use of a special skill in connection with the mail fraud; and (3) vacate the district court's order of restitution and remand to the district court for appropriate factual findings.

WELLFORD, <u>Circuit</u> <u>Judge</u>, concurring.

I concur in the majority opinion but write separately to emphasize several aspects of the case.  The amount paid by Maurello's fraud victims who indicated dissatisfaction with his services represents to this judge a good initial measure of the degree of "loss" involved by reason of this deceitful and unconscionable conduct by a disbarred lawyer.  The "value" of legal services is hard to gauge by laymen clients just as the "measure of harm" to these "clients" is difficult to assay.  It is also a serious challenge to ascertain to what extent Maurello's services may have benefitted the victims or "clients"

33

who did not complain. A qualified and licensed attorney may have done a better job for less money, or it may be that Maurello's services were actually inadequate, unknown to his "client." Upon the remand, I would emphasize that the district court must only determine whether the dissatisfied "clients" or victims have "a reasonable basis in fact" for their professed feeling of having been shortchanged by Maurello.

I am disposed to concur, not altogether enthusiastically, with my brothers in their interpretation of United States v. Kopp, 951 F.2d 521 (3d Cir. 1991), and United States v. Badaracco, 954 F.2d 928 (3d Cir. 1992), in assessing fraud loss under the guidelines. I find it difficult, however, to find a good analogy between the services of an unlicensed contractor in building a structure, and the services of a disbarred lawyer in handling a domestic relations case. Thus, I do not find United States v. Schneider, 930 F.2d 555 (7th Cir. 1991), particularly relevant.

I would also emphasize that the district court is "free to reconsider on remand" whether an upward departure is "appropriate" in light of all the circumstances.