OPINION
TASHIMA, Circuit Judge.
Brian Newmark appeals his conviction and sentence of 24 months’ imprisonment for a single count of wire fraud, under 18 U.S.C. § 1343. (App. 1-3.) We have jurisdiction under 28 U.S.C. § 1291 and 18 U.S.C. § 3742, and we will affirm.
I.
Newmark owned and operated companies that performed advertising and marketing services for Barry Bohmueller, an estates attorney. (App. 611-12, 615-18, 631, 760.) Newmark employed Victoria Larson and hired an independent contractor, John Wight. (App. 548, 631-32, 759.) None of the three individuals has ever been an attorney. (App. 721.)
Larson placed a sales call to Arthur Walker and Thomas Walker (the “Walkers”), elderly, unmarried and childless brothers who lived together in a house they jointly owned and whose assets were valued in excess of $3.5 million. (App. 270-72, 325-37, 608-09, 721.) The Walkers requested estate planning services from Bohmueller’s firm. (App. 363-64.) They also signed “Consultation Request Forms,” asking Bohmueller to set up a “free, no-obligation consultation with a financial services representative who is also a licensed insurance agent.” (App. 362-63, 406-09.)
Wight delivered and explained the Boh-mueller-prepared documents to the Walkers. (App. 370-72.) The Walkers introduced Wight to neighbors as their lawyer, *281 and Wight did not correct them. (App. 249, 309.) After the Walkers executed the documents, Wight, pursuant to Newmark’s companies’ business model, shifted to pitching them insurance-related and financial products. (App. 772-76.) Wight then discussed the Walkers’ investment objectives with Newmark, who recommended selling the Walkers charitable gift annuities. (App. 780-81, 785-86.)
Wight persuaded the Walkers to execute contracts to purchase six annuities using the bulk of their net worth. (App. 721, 819-23.) The purchase required the Walkers to liquidate and transfer assets that were being managed by Morgan Stanley. (App. 288-90.) A Morgan Stanley representative visited the Walkers’ home and convinced them to rescind their liquidation instructions because they did not need to purchase the annuities in order to accomplish their goals. (App. 292-93.)
After learning of the Morgan Stanley visit, Wight returned to the Walkers’ home with a portable fax machine. (App. 293-94, 622.) Wight conveyed information about the Morgan Stanley visit over the phone to Newmark, who composed two letters that were to be from Arthur and Thomas Walker, respectively, complaining about the Morgan Stanley visit. (App. 622, 1232.) Newmark faxed the letters to Wight, who had the Walkers sign them. (App. 622.) The letters were then faxed to Morgan Stanley’s Scranton, Pennsylvania, office. (Id.) A week later, Wight returned with two more letters complaining of Morgan Stanley’s failure to transfer the funds. (App. 624-25.) These letters were signed and faxed to Morgan Stanley’s New York City office. (Id.)
Morgan Stanley still having failed to comply with the Walkers’ request, New-mark called Morgan Stanley’s compliance department in New York City and spoke to Chris Zeyer about the firm’s failure to transfer the funds. (App. 460-64.) The same day, Newmark sent a fax to Zeyer, in which Newmark referred to the Walkers as “my clients.” (App. 468-69, 648-49.) The fax transmittal sheet had “Bohmueller Law Offices” letterhead, which Newmark later testified in a deposition he “must have made ... up.” (App. 648, 1239.) The fax also referred to “our attorney’s office” having contacted an individual at Morgan Stanley regarding the delayed transfer. (App. 471.) After the call, Zeyer completed a “verbal complaint form” from his handwritten notes, identifying Newmark as the Walkers’ attorney. (App. 462-65,481.)
Morgan Stanley eventually released the assets, enabling the Walkers to purchase the six annuities. Newmark’s company earned $230,408 in commission, from which it paid Wight $69,740. (App. 721.) Eventually, the Walkers came to feel unsatisfied with the annuities and retained an attorney, who sued Newmark, Wight, and others in federal court. (App. 547-51, 725.) The lawsuit settled. (App. 725.)
A Grand Jury indicted Newmark and Wight, charging them with mail and wire fraud, and charging Newmark with making a false declaration under oath (in connection with discovery responses he submitted in the civil suit). (App. 107-14.) The jury acquitted Wight of two counts and the District Court declared a mistrial as to his third. (App. 1224.) The jury convicted Newmark of three of his five counts. (App. 1224.) The District Court entered a judgment of acquittal on two of three counts for which the jury had convicted, leaving a conviction for a single count of wire fraud based on the fax Newmark transmitted to Zeyer. (App. 2.)
On appeal, Newmark argues that the evidence was insufficient to support conviction, that the district court erred in refusing to give an “ordinary prudence” jury *282 instruction, and that the district court miscalculated “loss” for sentencing purposes. (Appellant’s Br. 17-19.)
II.
We exercise plenary review of the District Court’s denial of a motion for judgment of acquittal based on insufficient evidence. See United States v. Silveus, 542 F.3d 993, 1002 (3d Cir.2008). We must determine whether the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to convict. See United States v. Hart, 273 F.3d 363, 371 (3d Cir.2001) (internal citations and quotation marks omitted).
Newmark contends that the evidence failed to show that he knowingly and willfully devised or participated in the particular scheme to defraud alleged in the indictment. (Blue 17-18.) He argues that the scheme alleged in the indictment was to defraud the Walkers,[1] and the only misrepresentations by Newmark were directed at Morgan Stanley, not the Walkers. (Id.; see also Blue 23.)
Newmark concedes that evidence showed the following: Newmark drafted and faxed letters to Wight for the Walkers to sign, telling Morgan Stanley to transfer the Walkers’ funds; Newmark made misrepresentations to Zeyer at Morgan Stanley; Newmark obtained an “enormous benefit” upon purchase of the annuities; Newmark, as owner and manager of his companies, held supervisory control over Wight. (Gray 6.) This evidence, although circumstantial, is sufficient for a rational trier of fact to have found beyond a reasonable doubt that Newmark knowingly and willfully devised or participated in the scheme to defraud. See United States v. Pearlstein, 576 F.2d 531, 541 (3d Cir.1978) (holding that requisite knowledge of fraudulent purpose can be demonstrated circumstantially).
Specifically, Newmark participated in the scheme when he drafted the letters necessary to transfer the Walkers’ assets and when he interacted with Zeyer at Morgan Stanley. See United States v. Olatunji, 872 F.2d 1161, 1168 (3d Cir.1989) (holding that misrepresentations need not be made to the ultimate victim for mail fraud). That Newmark “made up” a letterhead to misrepresent that he was an attorney — the same type of deception employed by Newmark’s paid associates— supports the inference that Newmark also “devised” the scheme, or at least knew of its fraudulent purpose. The jury could find further support in the fact that Newmark received a greater cut of the commission, cf. Pearlstein, 576 F.2d at 542 (noting that “relative lack of success enjoyed by” defendant salesmen compared with principals suggested they lacked knowledge of scheme’s fraudulent purpose), and held a position as owner and manager of the companies, cf. id. (noting that fact that defendant salesmen “held no positions of authority” and were never “involved in the management” of the company suggested they lacked knowledge of scheme’s fraudulent purpose).
Accordingly, we conclude that “there was substantial evidence adduced ... from which the jury reasonably could have inferred that [the defendant] knew of the fraudulent purpose of the ... enterprise and willfully participated therein.” See id. at 541. The District Court did not err in denying Newmark’s motion for a new trial.
III.
Newmark argues that the District Court plainly erred in not giving a jury *283 instruction defining “scheme to defraud” as a scheme “reasonably calculated to deceive persons of ordinary prudence and comprehension.” See United States v. Coyle, 63 F.3d 1239, 1243 (3d Cir.1995) (“The scheme [to defraud] ‘need not be fraudulent on its face but must involve some sort of fraudulent misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.’ ” (quoting Pearlstein, 576 F.2d at 535)). He argues that the alleged error was “compounded” by the District Court’s instruction that “[i]t is immaterial that the alleged victims may have acted gullibly, carelessly, naively or negligently, which led to their being defrauded.” (App. 1191.) Because Newmark did not object at trial, we review the District Court’s refusal to give an “ordinary prudence” jury instruction for plain error. See United States v. Antico, 275 F.3d 245, 265 (3d Cir.2001).[2]
The Government’s argument that the materiality instruction[3] adequately covers the “ordinary prudence” instruction, although supported by a district court case, see United States v. Zomber, 358 F.Supp.2d 442, 459 (E.D.Pa.2005), is unavailing. The materiality instruction concerns whether a reasonable person would consider a fact important, whereas the “ordinary prudence” instruction concerns whether a reasonable person would be deceived by a scheme. Moreover, because of the apparent tension between an instruction that a victim’s gullibility or negligence is no defense and an instruction that a scheme must be calculated to deceive a person of ordinary prudence and comprehension, there is some force to Newmark’s argument that the error was compounded by the district court’s inclusion of the former instruction.
Nonetheless, under the plain error standard, we conclude that the omission of the “ordinary prudence” instruction did not prejudice the jury’s deliberations. See United States v. Haywood, 363 F.3d 200, 207 (3d Cir.2004). Although there was evidence the Walkers signed documents that could be read to indicate that Wight was not an attorney, see App. 1229 (engagement letter stating delivery agent not licensed attorney); App. 1240-41 (consultation request form stating licensed insurance agent would provide consultation), this evidence was outweighed by the countervailing evidence that Wight affirmatively represented himself as an attorney.
Accordingly, we decline to exercise our discretion to conclude that the District Court committed plain error. See United States v. Olano, 507 U.S. 725, 736, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (holding that discretion should only be exercised where the error “seriously affects the fairness, integrity or public reputation of judicial proceedings” (alterations, citations, and quotation marks omitted)).
IV.
We exercise plenary review over the District Court’s interpretation of “loss” for purposes of United States Sentencing Guidelines (“U.S.S.G.”) § 2F1.1. See United States v. Badaracco, 954 F.2d 928, 936 (3d Cir.1992). “Loss” is defined as the value of the money, property, or services *284 unlawfully taken. See Coyle, 63 F.3d at 1250. “[T]he loss need not be determined with precision. The court need only make a reasonable estimate of the loss, given the available information.” U.S.S.G. § 2F1.1 (2000), Commentary n.9.
The District Court calculated a loss of $900,000, based on the value of the securities at the time of their sale ($3.5 million), less the value of the annuity received in exchange ($2 million), less the tax benefits obtained by making a contribution of the difference ($600,000). (App. 55-56 (adopting PSR ¶¶ 22-25, 30-36).) Newmark argues that this calculation fails to account for the $316,000 in capital gains taxes the Walkers avoided and the non-monetary value to the Walkers of making a charitable contribution.[4] (Blue 48-49.)
We conclude that the avoidance of capital gains taxes is too speculative to be considered value actually gained because it is not clear when, if at all, the Walkers would have sold their stocks. The non-monetary value is not properly considered because there is evidence that the Walkers did not want to make this type of charitable contribution. See United States v. Maurello, 76 F.3d 1304, 1311 (3d Cir.1996) (holding that clients who obtain satisfactory services have received something of value, while dissatisfied clients have not).[5]
Moreover, we conclude that any error was harmless. See United States v. Flores, 454 F.3d 149, 162 (3d Cir.2006) (holding that any error in imposing sentencing increases based upon loss calculation and other guidelines was harmless, where sentence imposed fell within the guidelines range that would have applied without the alleged errors). Here, as in Flores, the District Court applied the 18 U.S.C. § 3553(a) factors, rather than a specific departure or variance, to impose a sentence that fell below both the guidelines range the District Court calculated and the range that would be applicable without the alleged errors.[6] Thus it is clear that any “error did not affect the district court’s selection of the sentence imposed.” United States v. Langford, 516 F.3d 205, 218 (3d Cir.2008) (noting that harmless error may exist in “unusual case[s],” like Flores, where the sentence was a discretionary sentence imposed “based on 3553(a)’s parsimony provision” rather than a specific variance or departure).
V.
For the reasons set forth, we will affirm the judgment of the District Court.

. The indictment charged that Defendants “knowingly devised and intended to devise a scheme to defraud [the Walkers], and to obtain money and property from [the Walkers] by means of false and fraudulent pretenses, representations, and promises.” (App. 108.)

. To succeed under plain error review, New-mark must show that (1) the court erred; (2) the error was plain; and (3) the error affected substantial rights, meaning that the error prejudiced the jury's verdict. See Johnson v. United States, 520 U.S. 461, 466-67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). If all three elements are established, we may exercise our discretion to award relief. Id.

. "A material fact is a fact that would be of importance to a reasonable person in making a decision about a particular matter or transaction.” (App. 1184.)

. Newmark also argues that because the actual loss is "too complex and unusual to measure 'correctly,' ... the defendant's gain from the fraud is ... the only fair measure of 'loss.' ” See United States v. Yeaman, 194 F.3d 442, 456-57 (3d Cir.1999). The calculation method used in the Pre Sentence Investigation Report belies the notion that the actual loss is too complex to measure.

. Maurello was impliedly overruled by the Sentencing Commission in 2001. However, it is nonetheless instructive here because, for ex post facto reasons, the 2000 version of the Sentencing Guidelines applies.

.The District Court calculated a guidelines range of 30 to 37 months and, applying the Section 3553(a) factors, imposed a sentence of 24 months. (App. 61-67.) Taking into account the capital gains taxes allegedly avoided, the applicable range would have been 27 to 33 months. (Blue 48.)